THE GENERAL HOSPITAL CORPORATION[1] *vs.* MASSACHUSETTS BAY TRANSPORTATION AUTHORITY.

Suffolk. September 4, 1996. - November 14, 1996.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, & FRIED, JJ.

*Eminent Domain,* Extent of taking, Damages. *Real Property,* Easement.

In a land damage case, the judge correctly ruled that the owner of the parcel taken by eminent domain had full access and egress rights to the parcel in question to the extent the access did not interfere with an existing easement for purposes of the construction and maintenance of an elevated limited access highway ramp [763-768], and the judge correctly concluded that the Massachusetts Bay Transportation Authority had no right, either by reservation or easement, to use a portion of the parcel without a valid taking [768-769].

CIVIL ACTION commenced in the Superior Court Department on January 2, 1992.

The case was reported to the Appeals Court by *J. Harold Flannery,* J. The Supreme Judicial Court on its own initiative transferred the case.

*John W. Spencer* for the defendant.

*Neal C. Tully* for the plaintiff.

LYNCH, J. The General Hospital Corporation (MGH) brought an action in the Superior Court, pursuant to G. L. c. 79 (1994 ed.), for an assessment of damages caused by eminent domain takings made by the Massachusetts Bay Transportation Authority (MBTA). MGH owned the condemned parcel in fee simple, subject to an easement for highway purposes. The easement was taken by the Department of Public Works (DPW) in 1951 from the Boston and Maine Corporation (B&M), the predecessor in interest to

---

[1]Neither the judge's report or the Superior Court docket reflects that a motion to amend the complaint was allowed and an amended complaint was filed identifying the plaintiff as Massachusetts General Hospital in this case; both are part of the record appendix before this court.

MGH. A Superior Court judge made interlocutory rulings on matters essential to the question of damages and reported the matter to the Appeals Court, pursuant to Mass. R. Civ. P. 64, 365 Mass. 831 (1974), and G. L. c. 231, § 111 (1994 ed.). The judge ruled as follows:

> "1. Prior to February 2, 1989, the MGH had rights of access from Nashua Street and across the sidelines of Layout No. 3847 to the portion of the MGH's property that was acquired from the B&M in December 1965 and that was within the limited access highway established under Layout No. 3847; and the MGH had a right to use the property for all purposes that did not interfere with the right of the DPW to the enjoyment of the easement taken in the property; and

> "2. Prior to February 2, 1989, the MBTA, as successor to the B&M, had a right to use and enjoyment of whatever rights and easements were in effect as of February 2, 1989. The MBTA, as successor to the MTA, had no right to use the portion of the MGH's property which lay within the limited access highway established under Layout No. 3847."

We transferred the case here on our own motion and conclude there was no error in the judge's rulings.

The parties stipulated and the judge found as follows:

In April, 1951, the B&M conducted railroad operations in an area bounded by Causeway, Nashua, and Beverly Streets and the Charles River in the city of Boston (city), behind the Boston Garden. The B&M used the area between Nashua Street and Accolon Way, extending from the rear of North Station to the Charles River, for passenger and freight rail services. The B&M owned the area between Nashua Street and the primitive low water line in fee.[2] The Commonwealth owned the filled tidelands between the westerly sideline of Accolon Way and the primitive low water line, but granted B&M the right to use the area under a tideland license. The

---

[2]The primitive low water lines also denominated the historic low water line, and the line of extreme low water delineates the extreme low water limits before the tidelands were filled. This line designates the boundary between B&M's and the Commonwealth's properties.

Massachusetts Transit Authority (MTA), predecessor to the MBTA, operated two transit rail lines, commonly known as the Orange and Green Lines in the North Station area.

On April 27, 1951, the DPW recorded an order of taking (taking) with an accompanying layout plan. The layout outlined a limited access highway extending from Leverett Circle to the northwesterly sideline of Accolon Way behind the Boston Garden. Pursuant to St. 1950, c. 819, the Commonwealth partially revoked rights granted to the B&M under its tideland license, thereby allowing the DPW to use the tidelands for highway purposes.

The DPW took a permanent easement for highway purposes over land shown as Parcel 6-E1 on the plan. The B&M retained the underlying fee. Parcel 6-E1, located between the northwesterly sideline of Nashua Street and the line of primitive low water, is generally described as the area beneath the elevated ramp behind the Boston Garden.

The DPW excepted certain rights from the taking, including all lawful rights of the public to use the public streets and ways shown on the layout. The DPW also reserved rights to the MTA, allowing it to construct, reconstruct, maintain, repair, and operate its structures within the layout, provided there was no interference with the highway.

The taking designated access and egress to the parcel, in pertinent part, as follows:

> "Access to and egress from the State highway location is limited, being permitted across the location lines hereinbefore described only as follows:
>
> ". . .
>
> "2.  Access to and egress from said location is allowed across the northwesterly and southeasterly location lines at ground level between the points of beginning thereof and the line defining the limit of the tide lands of the Commonwealth of Massachusetts to those authorized to use the tide lands adjoining said location.
>
> "3.  Access to and egress from said location is allowed across the location lines for railroad purposes only within the limits of the property of the Boston and Maine Railroad.

"4. Access to and egress from said location is allowed the Metropolitan Transit Authority across the northwesterly and southeasterly location lines of the layout where necessary for the purpose of reconstructing, operating and maintaining its duly authorized facilities.

"5. Free access to and egress from said location is allowed at the following loci:

". . .

"(c) across the northwesterly and southeasterly location lines within the limits of the present street lines of Nashua Street."

Access and egress points across the location lines were noted on the layout plan accompanying the order of the taking.

In 1951 and 1952, an elevated ramp was constructed within the limited access highway layout. Where the ramp crosses over Parcel 6-E1, it is supported by five rows of three columns.

In January, 1959, the B&M removed tracks 17 through 23 from Parcel 6-E1 and in December 1961, it removed tracks 14 through 16, and converted the area into a parking lot.

On November 13, 1963, the DPW recorded Layout No. 4718. This layout transferred certain property, including the portion of Nashua Street abutting Parcel 6-E1, back to the city. There was no curb opening from Nashua Street to Parcel 6-E1 prior to February 2, 1989.

On December 29, 1965, the B&M conveyed a 306,000 square foot parcel of land adjacent to Nashua Street to MGH. The property conveyed included a portion of Parcel 6-E1. This portion of Parcel 6-E1, located directly beneath the elevated ramp, is at the center of this dispute.

In January, 1966, MGH obtained a permit from the city to use the premises acquired from the B&M, as an open air parking lot and also removed tracks 12 and 13. The MBTA disputes the legal authority of the city to issue a parking permit for the area within Parcel 6-E1. The permit was renewed annually from 1966 to 1989 and has been renewed since 1989 for the area outside the scope of the MBTA's taking, which precipitated this action.

On December 24, 1976, the B&M conveyed all rights in the property in the vicinity of North Station to the MBTA. In separate transactions, not important to this lawsuit, portions of the property acquired by MGH from the B&M were conveyed to third parties. As of February 3, 1989, the MGH parcel contained 154,894 square feet, including the area within Parcel 6-E1.

On February 2, 1989, the MBTA had taken land within the MGH parcel to construct an underground parking facility. The MBTA took the fee in Parcel P-27, but reserved to MGH air rights above thirty-five feet. Parcel P-27 is located within Parcel 6-E1. The MBTA also took temporary construction easements in Parcel T-26A, which made up the rest of MGH's property within Parcel 6-E1.

On April 14, 1993, the MBTA recorded another order of taking related to the underground parking facility. In general terms, this taking included a portion of the air rights above Parcel P-27 reserved to MGH in the 1989 taking.

The following issues are raised by the judge's rulings: (1) Whether MGH had any right of access to the portion of Parcel 6-E1 acquired from the B&M; and (2) whether the MBTA, as successor to the MTA, had any right to use MGH's property located within Layout No. 3847 prior to the February, 1989, taking.

1. *Access to Parcel 6-E1.* MGH has two possible routes of access to its property within Parcel 6-E1. The first possible access point is across the location lines of the layout where MGH's property abuts Parcel 6-E1. The second is across the sidelines of Nashua Street within the layout.

(a) *MGH's right of access across the location lines.* A limited access highway is defined as a highway over which the easement of access in favor of abutting land exists only at such points and in such manner as is designated in the layout plan. G. L. c. 81, § 7C (1994 ed.). The limited access highway layout is a tool used by the Commonwealth to restrict access to public highways and provide compensation for abutting landowners whose right of access is taken. See *Nichols* v. *Commonwealth*, 331 Mass. 581, 584 (1954).

The MBTA contends that the DPW's easement over Parcel 6-E1 prevents MGH's access, as successor to the B&M, to Parcel 6-E1 at ground level because the operative taking statute, G. L. c. 81, § 7C, limits access across the location lines.

Layout No. 3847 made exceptions to the no-access provisions for the B&M, but the MBTA argues that these exceptions were limited to either the B&M or railroad use. The MBTA also points to the layout plan, which marked the sideline of Parcel 6-E1 as "Access for Railroad," to support its position. In sum, the MBTA argues that we must construe Layout No. 3847 to mean that MGH had no right of access to Parcel 6-E1 across the location lines of the layout because there is no express exception to the no-access provision for anyone other than the B&M railroad.

MGH argues that Layout No. 3847 does not restrict its right to cross the location lines of the layout into Parcel 6-E1 because the DPW never intended to limit ground level access to the area subject to the easement. Essentially, the MBTA and MGH disagree on how to interpret the easement created by the order of taking.

The meaning and scope of an instrument of taking, so far as it affects private rights in property, is a question of law.[3] *Flagg* v. *Concord*, 222 Mass. 569, 572 (1916). When deciding the scope of an easement taken by eminent domain, we must consider the language of the taking order and the circumstances surrounding the taking. *Winnisimmet Co.* v. *Grueby*, 209 Mass. 1, 3 (1911), and cases cited. When the language in a taking order is unclear, the scope of the easement should be resolved in favor of freedom of the land from the servitude. *Hemenway* v. *Bartevian*, 321 Mass. 226, 229 (1947). The scope of the condemnor's use of the easement will be limited to the extent reasonably necessary for the purpose served by the taking, so that the landowner's right to use the easement area is as great as possible while remaining reasonably consistent with the purpose of the taking. See *Opinion of the Justices*, 208 Mass. 603, 605 (1911); *Newton* v. *Newton*, 188 Mass. 226, 228 (1905).

Layout No. 3847, considered in all its parts, and applied to the property described in it, manifests no intention by the DPW to limit B&M's access to Parcel 6-E1 over the location lines of the layout. Three factors aid us in reaching this conclusion: (1) The DPW took an easement, rather than a fee, for purposes of constructing an elevated highway ramp.

---

[3]An order of taking in writing, duly recorded, in conformity with the statute authorizing the order of taking, is to be treated as if it were a statute. *Boston* v. *Talbot*, 206 Mass. 82, 90 (1910).

(2) The fee owner's use in no way interferes with the highway use. (3) The DPW intended extensive use of the area under the ramp by providing many exceptions to the no-access provisions.

(1) *Easement, not a fee.* If the condemnor takes an easement, the owner retains title to the land in fee and has the right to make any use of it that does not interfere with the public use. See *Commonwealth* v. *Surridge,* 265 Mass. 425, 427 (1929); *Flagg* v. *Concord, supra* at 571; *Opinion of the Justices, supra.*

(2) *No interference with highway use.* Here, the DPW took the area designated in the layout to construct an elevated highway ramp. Layout No. 3847 states that the "easements are taken for highway purposes." The height of the ramp where it crosses Parcel 6-E1 was adequate to permit the owner of the underlying fee to use the area under the ramp without interfering with the limited access highway. The use of the land as a parking facility does not interfere with the highway ramp.[4] In *Commonwealth* v. *Surridge, supra,* this court held that the owner of the underlying fee subject to a highway easement may make any use of the land not inconsistent with the public purpose. MGH's access does not interfere with the highway use.

Furthermore, as a general rule, doubts as to the extent of a restriction in an easement "should be 'resolved in favor of freedom of land from servitude.' " *Hemenway* v. *Bartevian, supra,* quoting *St. Botolph Club, Inc.* v. *Brookline Trust Co.,* 292 Mass. 430, 433 (1935).

(3) *Access allowed.* The DPW provided considerable access over the location lines throughout the layout by creating many exceptions to the no-access limitation. The judge noted that the DPW permitted access over the location lines between Accolon Way and Nashua Street for abutters "seaward of the [primitive] low water line," and access for the B&M[5] "landward of the [primitive] low water line." The DPW also permitted access over the location lines within the sidelines of

_____

[4]The DPW, holder of the easement, never objected to MGH's use even though, as indicated in Layout No. 4718, the DPW's office building was located directly across Nashua Street from Parcel 6-E1.

[5]Layout No. 3847 states: "Access to and egress from said location across the northwesterly and southeasterly location lines for railroad purposes

Nashua Street. From the southwesterly sideline of Nashua Street to Leverett Circle access was permitted across the location lines for all public ways within the layout. Finally, the DPW gave the MTA, successor to the MBTA, access rights at numerous defined points to operate and maintain its structures. From a review of the layout plan there does not appear to be any area under the elevated structure that does not have access over at least one location line, or from a public way, or both. Therefore, Layout No. 3847 indicates that the DPW did not intend to restrict access under the ramp.

The MBTA also argues that the conveyance by the B&M to MGH stripped the owner in fee of the right to continue using the property as a parking lot because Layout No. 3847 limited access over the location lines to "for railroad purposes only." To eliminate access for a successor in interest to the B&M would be inconsistent with the general scheme of the free access found in the layout, especially where Parcel 6-E1 was the only parcel not taken in fee simple. "The words of a statute will not be read literally if to do so would be inconsistent with legislative intent." *Oxford* v. *Oxford Water Co.*, 391 Mass. 581, 592 (1984).

We conclude that MGH, as successor in interest to the B&M, has full access and egress rights to Parcel 6-E1 across the location lines of Layout No. 3847, to the extent that its access does not interfere with the elevated ramp.

(b) *MGH's right to access across the sidelines of Nashua Street.* MGH has a second possible route of access to the subject property. Parcel 6-E1 had eighty-seven feet of frontage on Nashua Street. The MBTA argues that the no-access rule in G. L. c. 81, § 7C, prevents access from Nashua Street to Parcel 6-E1 because the statute also prohibits general access within a limited access highway layout. The MBTA also relies on the language in part 5 (c) of Layout No. 3847 designating access, "[a]cross the northwesterly and southeasterly location lines *within* the limits of the present street lines of Nashua Street" (emphasis added). The MBTA claims the order of laying out took general access to the Parcel 6-E1 and confined the public's use of Nashua Street to within its existing sidelines. We do not agree.

There is nothing in the language of the statute or the order

only within the limits of the property of the Boston and Maine Railroad." MBTA claims that this is ambiguous and could be read as access for only railroad purposes or access for only B&M.

of laying out which indicates that access is restricted within the layout. As we have previously noted, G. L. c. 81, § 7C, provides in pertinent part: "A limited access highway is hereby defined to be a highway over which the easement of access in favor of abutting land exists only at such points and in such manner as is designated in the order of laying out." Layout No. 3847 states: "Access to and egress from the State highway location is limited, being permitted across the location lines hereinbefore described only as follows . . . ." General Laws c. 81, § 7C, limits access across the location lines, but the language does not attempt to restrict access within the layout.

Furthermore, the no-access exception in part 5 (c) of Layout No. 3847 does not prohibit an abutter from having access to Nashua Street. Layout No. 3847 permitted access over the location lines for public roads, including Nashua Street, at places all along the layout. We read part 5 (c) as simply describing an exception to the no-access provision at the point where Nashua Street crosses the boundaries of the layout, rather than restricting access from the sidelines of Nashua Street. "A general term in a statute or ordinance takes meaning from the setting in which it is employed. The literal meaning of a general term in an enactment must be limited so as not to include matters that, although within the letter of the enactment, do not fairly come within its spirit and intent." *Oxford* v. *Oxford Water Co., supra* at 592, quoting *Haas* v. *Breton,* 377 Mass. 591, 595 (1979).

In addition, the language in Layout No. 3847 provided, in pertinent part, that there is excepted from the rights taken, "all lawful rights of the public . . . to use those parts of the public streets and ways in the city of Boston which are included in the foregoing description." Access to a public way is a right of ownership appurtenant to land abutting a public way. See *Wenton* v. *Commonwealth,* 335 Mass. 78, 80 (1956); *Anzalone* v. *Metropolitan Dist. Comm'n,* 257 Mass. 32, 36 (1926). This language appears to preserve the abutters' right of access to public ways within the limits of the layout unless access was specifically terminated. The layout plan did specify locations along the sidelines of public roads within the layout where access was prohibited, but there was no such designation along the sidelines of Nashua Street adjacent to Parcel 6-E1. Furthermore, the DPW placed no restrictions on

the abutters' right of access to public ways when it transferred control of the roads within the layout back to the city in 1963. Therefore, we conclude that MGH had the right of access to Parcel 6-E1 from Nashua Street.

2. *MBTA's right to use Parcel 6-E1.* The MBTA suggests the 1989 and 1993 takings were unnecessary because the MBTA had a prior right to use the land within Parcel 6-E1. The MBTA posits that Layout No. 3847 gave the MTA the right to occupy and use any area within the layout for purposes related to the construction of an underground parking facility. We do not agree.

In Layout No. 3847, the DPW granted to the MTA the right to maintain its existing transit lines running through the limited access highway layout. In particular, the MTA had the right of access to the layout "for purposes of reconstructing, operating and maintaining its duly authorized facilities." The DPW also reserved an easement for the MTA to "construct, reconstruct, maintain, repair and operate [the] structures" in the layout. At the time of the taking the only structures belonging to the MTA within the layout were the elevated tracks running from North Station to Leverett Circle. No reasonable construction of the language of reservation would grant the MTA the right to construct an underground parking facility.

Furthermore, the DPW could not bestow on the MTA a right that it did not possess. In a taking by a public authority, the Legislature only grants such rights as are reasonably necessary to accomplish the public purpose. *Agostini* v. *North Adams Gas Light Co.*, 265 Mass. 70, 73 (1928), and cases cited. The Legislature authorized the DPW to take land to construct an elevated highway ramp. St. 1950, c. 819. The DPW could not exceed this authority. See *id.* In *Agostini* v. *North Adams Gas Light Co., supra,* a railroad corporation was authorized to take an easement in land to construct a road. We held that this authority did not give the railroad the right to give permission to an electric power company to erect power lines on the land against the objection of the owners. The 1951 taking does not contemplate the construction by the DPW of an underground parking facility. Therefore, the DPW could not have granted such a right to the MTA. See *id.* Moreover, the DPW's authority to take the

B&M's property was restricted by G. L. c. 160, § 104.[6] As the judge noted, it is highly questionable whether the DPW had the legal authority to take away the B&M's ability to operate a railroad on Parcel 6-E1.

In the alternative, the MBTA contends that it obtained the right to use Parcel 6-E1 under the 1976 agreement with the B&M. According to the MBTA, that agreement conveyed certain railroad property from the B&M to the MBTA, including "all rights and easements appurtenant thereto." The MBTA argues that the appurtenant rights included rights in Parcel 6-E1 as a result of the exception in Layout No. 3847 that permit the B&M access to the layout across the location lines for railroad purposes. We disagree.

The B&M sold its interest in Parcel 6-E1 to MGH in 1963. This sale extinguished the B&M's rights in Parcel 6-E1. Therefore, the B&M could not have given the MBTA the right to use Parcel 6-E1 in the 1976 agreement.

The MBTA recorded takings in 1989 and 1993 to obtain the right to use property owned by MGH for an underground parking facility. These takings were necessary because the MBTA had no prior right to occupy MGH's property within Parcel 6-E1.

We have considered all the challenges argued to us with respect to the rulings the judge reported for appellate review and conclude there was no error in those rulings. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

[6]General Laws c. 160, § 104, as amended through St. 1955, c. 231, states in pertinent part: "A public way may be laid out across a railroad previously constructed . . . in such manner as not to injure or obstruct the railroad . . . ."