A.M.NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-13300


SMILEY FIRST, LLC  vs.  DEPARTMENT OF TRANSPORTATION.



Suffolk.      November 4, 2022. – May 23, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt, & Georges, JJ.


Easement.  Eminent Domain, Extent of taking.  Real Property, Easement.  Railroad.



Civil action commenced in the Superior Court Department on January 24, 2020.

The case was heard by Paul D. Wilson, J., on motions for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.


Paul L. Feldman (Shawn M. McCormack also present) for the plaintiff.
Kendra Kinscherf, Assistant Attorney General, for the defendant.
Ben Robbins & Daniel B. Winslow, for New England Legal Foundation, amicus curiae, submitted a brief.
Deborah J. La Fetra, of California, Sam Spiegelman, of Washington, & Jonathan M. Houghton, for Pacific Legal Foundation, amicus curiae, submitted a brief.

GEORGES, J.  In this case, we consider whether an easement taken by eminent domain in 2018 (2018 easement) by the defendant, the Department of Transportation (MassDOT), exceeded the scope of an easement taken in 1991 (1991 easement) by MassDOT's predecessor in interest, the Department of Public Works (DPW), with respect to certain land in the South Boston section of Boston (burdened land) that presently is owned by the plaintiff, Smiley First, LLC (Smiley).

DPW's 1991 order of taking (1991 taking) created an easement over the burdened land for purposes of "the relocation of the facilities of the Consolidated Rail Corporation [(Conrail)]," which were going to be displaced by construction of a haul road for the Central Artery/Tunnel Project, also known as the "Big Dig."[1]  In 2017, the Massachusetts Bay Transportation Authority (MBTA) announced plans to construct a test track and a 6,000 square foot building for newly purchased subway cars (Red Line test track project) on the portion of Smiley's land burdened by the 1991 easement.  MassDOT then recorded the 2018 confirmatory order of taking (2018 taking), which provides that it is to confirm and, "to the extent necessary to establish such

---

[1] The Central Artery/Tunnel Project rerouted the Central Artery, a portion of Interstate Route 93 that ran through the city of Boston on an elevated highway, to an underground tunnel. DPW and Massachusetts Bay Transportation Authority operated together on the Big Dig project.  MassDOT is the lawful successor to DPW in accordance with G. L. c. 6C.

rights, acquire[]" an easement "for railroad purposes" that include the Red Line test track project.

Based on its contention that the 2018 taking merely confirmed rights that it already held under the 1991 taking, MassDOT refused to pay Smiley any compensation for the 2018 taking, and this litigation ensued. On the parties' cross motions for partial summary judgment, a Superior Court judge determined, in reliance on his understanding that easements taken by eminent domain are not subject to the ordinary rules of interpretation of easements, that the 1991 easement was a grant to use the entire area of the easement for "any 'railroad purpose,'" including the Red Line test track project, and, accordingly, that Smiley was due no compensation as a result of the 2018 taking.

We hold that, while the intent of the parties is not to be considered when an easement is taken by eminent domain, the ordinary rules of interpretation for easements otherwise apply. Thus, the "scope of the condemnor's use of the easement will be limited to the extent reasonably necessary for the purpose served by the taking, so that the landowner's right to use the easement area is as great as possible while remaining reasonably consistent with the purpose of the taking." General Hosp. Corp. v. Massachusetts Bay Transp. Auth., 423 Mass. 759, 764 (1996). Applying this principle here, we conclude that the 1991 easement

was more limited in scope than the 2018 easement and, in particular, did not encompass a use such as the Red Line test track project. Therefore, the summary judgment in favor of MassDOT must be reversed, and the matter remanded to the Superior Court for a determination of the appropriate compensation due Smiley.[2]

1. Background. We summarize the undisputed facts set forth in the motion judge's decision on the parties' cross motions for partial summary judgment, supplemented by other uncontroverted facts in the summary judgment record. See Williams v. Board of Appeals of Norwell, 490 Mass. 684, 685 (2022).

a. Smiley's property. In 2015, Smiley acquired an 18,088 square foot parcel of land at the intersection of B Street and Cypher Street in South Boston. Approximately 12,510 square feet of that property comprise the burdened land at issue here, which is contained within one of the parcels, parcel 60-E-RR-1, subject to the 1991 taking.

b. 1991 taking. In 1991, DPW laid out a limited access State highway, known as the South Boston Haul Road (haul road), to support construction of the extension of Interstate Route 90 to the proposed third harbor tunnel, as part of the Central

---

[2] We acknowledge the amicus briefs by the New England Legal Foundation and the Pacific Legal Foundation.

Artery/Tunnel Project. Construction of the haul road was a massive enterprise that affected over 1 million square feet of land spread across twenty-eight parcels owned by multiple different owners.

To acquire property for the haul road, the 1991 taking took in fee simple approximately 400,000 square feet of land occupied by Conrail, which is not at issue in this appeal. Because this action displaced Conrail's rail operations, the order also established easements on several neighboring parcels, including over 12,510 square feet of parcel 60-E-RR-1, so that Conrail could relocate its railroad operations there. Specifically, the order provides:

> "In connection with the laying out of the State highway hereinbefore described, it is necessary to relocate portions of railroad rights of way and land is hereby acquired for said relocation as follows:
>
> "Easements are hereby taken in parcels 60-E-RR-1, 60-E-RR-5, and 60-E-RR-6, shown on the plan hereinafter referred to, for the relocation of facilities of the Consolidated Rail Corporation, including all trees and structures located thereon . . . .
>
> "Said easements (i) shall be used for railroad purposes only, (ii) shall not be used for the storage of any hazardous materials, hazardous wastes or hazardous substances other than in connection with the extension of Interstate Route 90 or the reconstruction of Interstate Route 93, and (iii) shall be subject to the rights of the owner of the underlying fee as hereinafter provided. . . .
>
> "Said railroad easements are acquired in limited vertical dimension only, said area being limited to a height of [twenty feet, six inches] above the top of the rails to be placed thereon. Included in the easements, however, is the

unlimited right to utilize the air rights above [twenty feet, six inches] for twelve (12) years following the date of recording of this taking. Thereafter, the use of said easements shall be subject to the rights of the owner of the air rights so reserved to use the area subject to the easements as reasonably may be required, subject to the approval of the party or parties having the benefit of the easements, for access to and to support the uses of the air rights."

This order by its terms defined the 1991 easement, and, pursuant to it, Conrail subsequently relocated its main line to a single track that crosses land, now part of Smiley's property, that is burdened by the 1991 easement.

c. 2018 taking. Through a series of transactions, MassDOT ultimately acquired the 1991 easement.[3] MassDOT subsequently sponsored the MBTA's Red Line test track project and authorized the MBTA to use MassDOT's land and rights in land for the project. MassDOT and the MBTA also publicly declared that the entirety of the burdened land on Smiley's property was subject to the MBTA's exclusive use for any railroad purpose, including the Red Line test track project.

After Smiley filed a complaint in the Land Court challenging MassDOT's authority to use the burdened land for the

---

[3] In 1997, the Commonwealth conveyed the 1991 easement to Conrail. On June 1, 1999, Conrail sold its Boston rail assets to New York Central Lines LLC, which subsequently merged into CSX Transportation, Inc. (CSX). Through a release deed dated June 11, 2010, CSX conveyed to MassDOT its right, title, and interest in the 1991 easement, subject to a retained easement for CSX's continued freight service.

Red Line test track project, MassDOT recorded the 2018 taking. That order purported to "confirm and, to the extent necessary to establish such rights, acquire[] an easement for railroad purposes as . . . set forth in the 1991 [t]aking and/or in this instrument," including testing and storage of rapid transit rail vehicles and reasonably related uses such as access, parking, and utility needs. "For the further avoidance of doubt," the order explicitly declared that these uses included the Red Line test track project.

    d.  <u>Prior proceedings</u>.  Following dismissal of its initial suit without prejudice,[4] in 2020, Smiley filed a new complaint against MassDOT in the Superior Court, seeking declaratory and equitable relief pursuant to G. L. c. 231A, § 1, with respect to the parties' respective rights under the 1991 easement as of January 11, 2018 (the day before the 2018 taking), and damages pursuant to G. L. c. 79, for the taking by MassDOT on January 12, 2018.

---

    [4] A Land Court judge dismissed Smiley's quiet title claims, but not the declaratory judgment claims, which, by agreement of the parties, were transferred to the Superior Court. A Superior Court judge dismissed those claims without prejudice, ruling that the remaining declaratory judgment claims had to be combined in a single action with a claim for land damages. Smiley then filed his current complaint in the Superior Court in January 2020; the resulting judgment is what is now before us on appeal.

Following a nonevidentiary hearing on the parties' cross motions for partial summary judgment, a Superior Court judge denied Smiley's motion, allowed MassDOT's cross motion, and dismissed Smiley's claim for compensation under G. L. c. 79. The judge agreed with MassDOT that the 1991 "easement, by its terms, may be used for any 'railroad purposes,' which includes the construction of a test track and building to test newly-purchased subway cars." Smiley filed an appeal with the Appeals Court, and we transferred the case to this court on our own motion.

2. Discussion. a. Standard of review. "We review a decision on a motion for summary judgment de novo and, thus, accord no deference to the decision of the motion judge" (quotation omitted). Williams, 490 Mass. at 689-690, quoting Tracer Lane II Realty, LLC v. Waltham, 489 Mass. 775, 778 (2022). "The allowance of a motion for summary judgment 'is appropriate where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law.'" Williams, supra at 689, quoting Barron Chiropractic & Rehabilitation, P.C. v. Norfolk & Dedham Group, 469 Mass. 800, 804 (2014). Where both parties have moved for summary judgment, "the evidence is viewed in the light most favorable to the party against whom judgment" has been entered.

Green Mountains Ins. Co. v. Wakelin, 484 Mass. 222, 226 (2020), quoting Boazova v. Safety Ins. Co., 462 Mass. 346, 350 (2012).

b. Principles governing easements taken by eminent domain. "The meaning and scope of an instrument of taking, so far as it affects private rights in property, is a question of law." General Hosp. Corp., 423 Mass. at 764, citing Flagg v. Concord, 222 Mass. 569, 572 (1916).

We begin by reviewing the principles governing our general construction of easements. "An affirmative easement 'creates a nonpossessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement.'" Patterson v. Paul, 448 Mass. 658, 663 (2007), quoting Restatement (Third) of Property: Servitudes § 1.2(1) (2000). "Restrictions on land 'are disfavored,' . . . and doubts concerning the rights of use of an easement 'are to be resolved in favor of freedom of land from servitude'" (citation omitted). Martin v. Simmons Props., LLC, 467 Mass. 1, 9 (2014). "[T]he servient owner retains the use of his [or her] land for all purposes except such as are inconsistent with the right granted to the dominant owner" or acquired by that owner. Merry v. Priest, 276 Mass. 592, 600 (1931).

The motion judge concluded that "[t]hese principles . . . do not assist Smiley," and Smiley's reliance on them was

misplaced, because they derive from cases that concern "transfers or prescriptive rights involving private parties" (emphasis added), Mugar v. Massachusetts Bay Transp. Auth., 28 Mass. App. Ct. 443, 445 (1990).  The conclusion that easements taken by eminent domain are not to be construed in favor of freedom of the land from servitude was error.

As MassDOT points out, an easement taken by eminent domain must be construed in light of the language of the order of taking and the "circumstances surrounding the taking."  General Hosp. Corp., 423 Mass. at 764.  This approach differs in one respect from negotiated easements, as the intents of the owner and the government entity taking the easement are not relevant. See Mugar, 28 Mass. App. Ct. at 445 (intent of parties is irrelevant in construing easement taken by eminent domain because "[t]he taking of private property for a public purpose may be accomplished without the consent of the owner," and "the intent of the governmental body is largely beyond the scope of judicial scrutiny").  Thus, "principles of interpretation designed to give effect to the express or implied intent of parties contracting for or acquiring an interest in land . . . are, in general, inapplicable to eminent domain proceedings." Taylor v. Martha's Vineyard Land Bank Comm'n, 475 Mass. 682, 690 n.17 (2016), quoting Bateman v. Board of Appeals of Georgetown, 56 Mass. App. Ct. 236, 239 (2002).

But that does not mean that an easement taken by eminent domain is insulated from application of the ordinary rules of construction otherwise applicable to the interpretation of easements.  Apart from consideration of the parties' intent, which is inapplicable to takings by eminent domain, we consistently have applied the same rules of construction to easements taken by eminent domain as are applicable to privately granted easements.  Most significantly with respect to the issues here, whether an easement has been established by eminent domain or granted privately, "as a general rule, doubts as to the extent of a restriction in an easement 'should be resolved in favor of freedom of land from servitude.'"  General Hosp. Corp., 423 Mass. at 765, quoting Hemenway v. Bartevian, 321 Mass. 226, 229 (1947).  As with an easement that was privately granted,

> "[t]he scope of the condemnor's use of the easement will be limited to the extent reasonably necessary for the purpose served by the taking, so that the landowner's right to use the easement area is as great as possible while remaining reasonably consistent with the purpose of the taking. . . . If the condemnor takes an easement, the owner retains title to the land in fee and has the right to make any use of it that does not interfere with the public use."

General Hosp. Corp., supra at 764-765.  See Agostini v. North Adams Gaslight Co., 265 Mass. 70, 73 (1928) ("In a taking by eminent domain only such rights are acquired as are reasonably necessary to accomplish the purpose for which the taking is

made, unless the Legislature authorizes the acquiring of greater rights").

With these principles in mind, we turn to consider the easements at issue in this case.

c. Scope of 1991 easement. In determining the scope of the 1991 easement, we begin with the language of the 1991 taking, which expresses the purpose for which the easement was taken and the circumstances of the taking. The 1991 order clearly states that the purpose was to facilitate "the laying out of the State highway" for the Central Artery/Tunnel Project by "relocat[ing] portions of railroad rights of way," and, more specifically, "relocat[ing] . . . the facilities of [Conrail]." Accordingly, by its plain language, the scope of the easement is limited to the extent reasonably necessary to relocate Conrail's facilities. See General Hosp. Corp., 423 Mass. at 764 (questions about extent of eminent domain takings "should be resolved in favor of freedom of the land from the servitude").

MassDOT correctly points out that the 1991 license agreement between the Commonwealth and Conrail permitted the 1991 easement to be used by Conrail for ancillary activities that constituted "railroad purposes":

"(i) for the construction and maintenance of the temporary rail yard; (ii) for materials handling and processing; and (iii) for use by Conrail, its authorized customers, agents and assigns for railroad purposes (freight or passenger), including the loading and unloading of rail cars or

> containers, the classifying and assembling of trains, the temporary storage of operating rolling stock or for such other railroad purposes related to the transportation of freight and commodities by rail."

But this license could not unilaterally expand the scope of the permissible use of the burdened land beyond what was stated in the 1991 taking.  Moreover, consistent with the purpose stated in the 1991 taking, the license agreement similarly recites that the Commonwealth is entering into the license agreement "to partially replace and restore the [c]urrent [Conrail] Rail Facilities and Conrail Land affected or eliminated by the Haul Road."  Thus, the Commonwealth's licensing of these activities was still governed by the over-all purpose set out in the 1991 taking -- enabling Conrail to relocate the facilities being displaced by the haul road.

It is also important to recognize that the 1991 easement for the relocation of Conrail's facilities was limited in space and time by the air rights reserved to the fee holder.  As defined in the 1991 taking, the easement included a vertical dimension of twenty feet and six inches "above the top of the rails to be placed" on the property, "subject to the rights of the owner of the air rights" above that height after a certain period of time.  For the first twelve years after the recording of the taking, Conrail, as the beneficiary of the easement, also enjoyed "the unlimited right to utilize the air rights above"

twenty feet and six inches.  "Thereafter, the use of said easements shall be subject to the rights of the owner of the air rights so reserved . . . for access to and to support the uses of the air rights."  Notably, the twelve-year period coincided with the time frame in which Conrail was to complete the relocation of its track and other facilities, and for the haul road to be constructed.  Otherwise put, the fee holder had to wait twelve years before developing its air rights, so as to allow Conrail time to relocate its operations, in accordance with the purpose of the taking.  Once Conrail accomplished that purpose by relocating a single track to the property, the scope of the easement established thereunder was fixed and limited to the right of way occupied by Conrail's track and the vertical dimension above it.[5]

---

[5] As we discuss further infra, the operation of the air rights provision in the 1991 easement was analogous to the well-established doctrine of practical location.

> "Where a right of way, or other easement, is granted by deed without fixed and defined limits, the practical location and use of such way or easement by the grantee under [the] deed, acquiesced in by the grantor at the time of the grant and for a long time subsequent thereto, operate as an assignment of the right, and are deemed to be that which was intended to be conveyed by the deed, and are the same, in legal effect, as if it had been fully described by the terms of the grant."

Bannon v. Angier, 2 Allen 128, 129 (1861).  See Naumkeag Steam Cotton Co. v. American Glue Co., 244 Mass. 506, 508 (1923) ("When the exact location of the easement is not precisely defined but has been exercised in a certain place, the grantee

Our interpretation of the extent of the 1991 easement is supported by one of our rulings in General Hosp. Corp. In that case, Massachusetts General Hospital had acquired property that was subject to an easement taken by DPW for the purpose of constructing an elevated highway ramp. General Hosp. Corp., 423 Mass. at 759-760. The hospital and the MBTA then disputed the scope of this easement in the hospital's suit seeking damages for the MBTA's subsequent eminent domain takings of hospital property. Id. Specifically, the MBTA contended that the hospital had no right to access its property across location lines shown on the highway ramp layout. Id. at 763-764.

We concluded, however, that, as the fee owner, the hospital had the right to access its property across these location lines, given that DPW had only taken an easement on the property, not a fee; the easement had been taken for "highway purposes"; and "[t]he height of the ramp where it crosse[d] [the

---

has not the right afterwards to change the location to some other part of the land"); Chandler v. Jamaica Pond Aqueduct Corp., 125 Mass. 544, 550 (1878) (easement to lay pipes and keep and support them forever did not include right to change location of pipes once they had been laid). See also Restatement (Third) of Property: Servitudes § 4.8 comment c ("When improvements are constructed or installed on the servient estate for the enjoyment of a servitude without objection from the servient owner, the parties have given a practical construction to the instrument or agreement that created the servitude. Even if the instrument specifies a different location, the location is fixed by the placement of the improvements unless the language or circumstances lead to the conclusion that the initial location is temporary").

property] was adequate to permit the owner of the underlying fee to use the area under the ramp without interfering with the limited access highway."  Id. at 764-765.  Once DPW had constructed the highway ramp, the hospital was free to access and use the remaining land for parking, as long as the parking did not interfere with the highway.  See id. at 765-766.  Similarly, here, under the 1991 taking, the fee holder of what is now Smiley's land was entitled to access to the burdened land, so long as that access did not interfere with the operations of the railroad track built by Conrail.

d.  Scope of 2018 taking.  The 2018 taking provides that the easement for "railroad purposes" "permits [MassDOT] and its lawful successors and assigns to use the Remainder Railroad Easement Area for all lawful railroad purposes within the Commonwealth of Massachusetts."  The 2018 taking further specifies that such uses shall include "(a) the use of the Remainder Railroad Easement Area[6] by railroads powered by any source, for purposes including, but not limited to, the deployment, testing, calibration, and storage of rapid transit rail vehicles; and (b) uses reasonably related to such railroad

---

[6] The 2018 taking defines the "Remainder Railroad Easement Area" as "an easement for railroad purposes as described and more particularly set forth in the 1991 [t]aking and/or in this instrument over the parcel of land comprised of portions of the Easement Parcel as more particularly shown on the plan of land hereinafter described."

purposes such as access, parking and utility needs in connection therewith."

We conclude that the scope of the 2018 easement exceeds the scope of the 1991 taking and that the motion judge erred in determining otherwise. The judge misconstrued the extent of the 1991 easement in large part because, in his view, certain ordinary rules of construction of easements were inapplicable to an easement taken by eminent domain. As stated, however, other than the exclusion of any consideration of the parties' intent, we consistently have applied the ordinary rules of interpretation of easements to easements taken by eminent domain, see General Hosp. Corp., 423 Mass. at 764-765, and MassDOT has not proffered any reason for us to revisit that view.

Here, whereas the purpose of the 1991 taking was to relocate railroad rights of way and Conrail's facilities, the 2018 taking provides, "[f]or the avoidance of doubt," that it encompasses the 1991 purpose, but that it also includes "all lawful railroad purposes within the Commonwealth." Specifically, the 2018 taking states that it encompasses, "without limitation," testing, calibration, and storage of any type of railroad vehicle, and the associated uses such as parking that are necessary to those primary uses.

The Red Line test track project, which falls within this language, is a new and different project from the original relocation of Conrail's railroad track and facilities. It involves an additional 6,000 square foot building, a different type of railroad car, and a considerably larger portion of the burdened land than did the single track originally constructed by Conrail pursuant to the 1991 easement. Indeed, the 2018 taking permits the easement holder to use the "Remainder Railroad Easement Area" -- i.e., the entirety of the burdened land, not just the right of way taken up by the relocated Conrail track -- for "all lawful railroad purposes within the Commonwealth." Thus, the easement holder now may engage in any "railroad purposes," anytime and anywhere on the burdened land. Consequently, the 2018 easement makes it virtually impossible for the fee holder to build anywhere else on the burdened land, because the owner of the fee can never know whether or when the easement holder might seek to exercise its rights on that part of the burdened land.

MassDOT raises a number of arguments as to why the 1991 easement is just as sweeping in extent as the 2018 easement. These arguments are unpersuasive. If the purpose of the 1991 easement was to relocate Conrail's right of way and facilities to support construction of the haul road, and if the location of the easement became fixed once Conrail completed that process,

then clearly the 1991 easement did not authorize the very different and larger Red Line test track project nearly thirty years later.  In particular, MassDOT contends that the provision in the 1991 taking that the easement "shall be used for railroad purposes only" broadly authorizes use of the 1991 easement for any railroad purpose in the future, including the Red Line test track project.  That provision, however, is plainly a restriction on the use of the 1991 easement; it prohibits Conrail or a successor from using the easement for something other than railroad purposes.  As such, it remains subordinate to the over-all governing purpose of the 1991 easement, namely, the relocation of Conrail's right of way and facilities to support construction of the haul road.  The provision does not supersede that overarching governing purpose so as to expand the scope of the easement to include any future railroad purpose.

As discussed, an easement taken by eminent domain must be construed in light of the "circumstances surrounding the taking."  General Hosp. Corp., 423 Mass. at 764.  In that case, for example, DPW had granted the Massachusetts Transit Authority (MTA) (the predecessor of the MBTA) the right to maintain its existing transit lines running through a DPW highway layout. Id. at 761.  The right to maintain included the right to "construct, reconstruct, maintain, repair, and operate [the] structures."  Id.  Because the MTA's only structures within the

layout at that time were elevated tracks, no reasonable interpretation of the language of the easement granted the MTA the right to build an underground parking garage. Similarly, here, the phrase "for railroad purposes only" in the 1991 taking should not be viewed out of context as authorizing the Red Line test track project nearly thirty years later, when clearly the purpose of the 1991 taking was to facilitate the relocation of Conrail's facilities.

e. Use of like kind. MassDOT further argues, relying on Leroy v. Worcester St. Ry., 287 Mass. 1, 10-15 (1934), that the use of the easement for a test track and a building to hold new subway cars was permissible under the 1991 taking because the new use did not differ in kind from the original railroad use set forth in the 1991 taking. In Leroy, the court held that an easement that had been taken for operation of a steam railway properly could be used for a motor bus, applying the principle that an easement taken for one public purpose may be used for a "public use of a like kind." Leroy, supra at 13. In either event, the court reasoned, "the essential purpose was to . . . transport members of the public." Id. at 12.

The Red Line test track project, however, is not a public use of a like kind. The 1991 easement provided Conrail the right to relocate its operations, which proved to be a single track. In contrast, the Red Line test track project involves

not only a test track, but also a large new building, parking, and another track.

f.  Doctrine of practical location.  MassDOT also contends that because the 1991 easement covered the entirety of the 12,510 square foot area set forth in the 1991 taking, the use of the entire burdened area for the Red Line test track was permissible.  We disagree.

The 1991 taking states at the outset of the relevant passage that "[e]asements are hereby taken in [three] parcels[, including] 60-E-RR-1, . . . for the relocation of the facilities of [Conrail]."  Contrary to MassDOT's contention, this language does not "clearly and unambiguously" establish that those easements were intended to cover the entirety of each parcel.  Rather, the language merely refers to an easement in some portion of each enumerated parcel.

Under the 1991 easement, Conrail was free to relocate its operations wherever it chose within the scope of the easement on each parcel.  Once it did so, however, the location of the easement became fixed, see Leroy, 287 Mass. at 14; Naumkeag Steam Cotton Co. v. American Glue Co., 244 Mass. 506, 508 (1923), and the fee owner was free to develop the remainder of the parcel and the air rights, see General Hosp. Corp., 423 Mass. at 764.  MassDOT's contention that possession of the easement continued to give the easement holder complete control

to construct additional facilities anywhere on the burdened land is inconsistent with the fundamental principles limiting the dominant estate to the extent reasonably necessary for the purpose of the taking, and protecting the right of the fee holder to use the easement area to as great an extent as possible, see id., as well as with the doctrine of practical location, see Naumkeag Steam Cotton Co., supra; Bannon v. Angier, 2 Allen 128, 129 (1861).

For this reason, we reject, as inapplicable, MassDOT's argument that it would have been illegal under Federal law for Conrail to "abandon" its rights over the rest of the burdened land.  Conrail never possessed a right to occupy the entire parcel of burdened land in perpetuity.  Conrail only possessed a right to place its tracks and facilities in the place of its choosing on the burdened land.[7]

We also conclude that the Appeals Court's decision in Mugar, which MassDOT cites and upon which the motion judge substantially relied, is distinguishable from the present case. Mugar involved an action for compensation where the MBTA had taken an easement for an "undefined right of access" from

---

[7] MassDOT also cites Mahan v. Rockport, 287 Mass. 34, 37 (1934), for the proposition that rights are not lost by using less than the entire area taken, but that case involved a public way, which "once duly laid out continues to be such until legally discontinued," and "may be discontinued by vote of the town and not otherwise."

surrounding city streets to a parcel containing a subway vent shaft near the center of the plaintiffs' parking lot. Mugar, 28 Mass. App. Ct. at 443-444. Because this access easement gave the MBTA unlimited rights of passage from the city streets, it necessarily prevented the plaintiffs from building anywhere in the parking lot. See id. at 444. By contrast, here the 1991 taking included language that limited the scope of the easement to the relocation of Conrail's facilities and explicitly allowed the fee holder to develop the air rights on the burdened land after a twelve-year period.

We are mindful that, in exercising the power of eminent domain in 1991, DPW had the power to choose how it wished to articulate the scope of the easement. If it had intended to establish a perpetual right to occupy all of the burdened property, then it could have done so unequivocally, but it did not. When the scope and extent of a taking is unclear, we must adopt the narrower interpretation of its language, in favor of freedom of the land from servitude, as long as it is otherwise consistent with applicable legal principles. See General Hosp. Corp., 423 Mass. at 764.

g. Just compensation. Because the scope of the 2018 easement exceeded the scope of the 1991 easement, it represented an additional taking. Accordingly, Smiley's claim for damages

under G. L. c. 79 should not have been dismissed, and, on remand, Smiley is entitled to pursue its claim for damages.

3. Conclusion. The summary judgment is reversed. The matter is remanded to the Superior Court for entry of a declaratory judgment in favor of Smiley that the 2018 easement exceeded the scope of the 1991 easement and, in particular, did not encompass a use such as the Red Line test track project, and for further proceedings on the compensation Smiley is due pursuant to G. L. c. 79, § 14, as a result of the 2018 taking.

So ordered.